# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **FEDERAL TRADE COMMISSION and UTAH DIVISION OF CONSUMER PROTECTION,**<br><br>　　　　　　**Plaintiff,**<br><br>vs.<br><br>**ZURIXX, LLC, ET AL.,**<br><br>　　　　　　**Defendants.** | **MEMORANDUM DECISION AND ORDER**<br><br>**Case No. 2:19CV713-DAK-EJF**<br><br>**Judge Dale A. Kimball**<br><br>**Magistrate Judge Evelyn J. Furse** |

This matter is before the court on Defendants Zurixx, LLC, Carlson Development Group, LLC, CJ Seminar Holdings, LLC, Zurixx Financial, LLC, Christopher A. Cannon, James M. Carlson, and Jeffrey D. Spangler's Partial Motion to Dismiss [ECF No. 62]. On February 12, 2020, the court held a hearing on the motion, At the hearing, Amanda R. Grier and Joshua A. Doan represented the Federal Trade Commission ("FTC"); Thomas M. Melton, Robert G. Wing, and Kevin M. McLean represented the Utah Division of Consumer Protection ("Division"); and Leonard L. Gordon, Stephen R. Freeland, Eric G. Benson, and Z. Ryan Pahnke represented Defendants. After hearing argument, the court took the matter under advisement. After carefully considering the memoranda and other materials submitted by the parties, as well as the law and facts relating to the motions, the court issues the following Memorandum Decision and Order.

**BACKGROUND**

Because this case comes before the court on a motion to dismiss, the court accepts as true all well-pled factual allegations contained in the Complaint. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007).

The Complaint alleges that since at least July 2013, Defendants operated a deceptive scheme to entice consumers into purchasing a sequence of increasingly expensive real estate investment training programs and related products that purport to allow consumers to make thousands of dollars in profit through two investment strategies: fix and flip and wholesale flips. A fix and flip involves purchasing and renovating property before selling it to an end user. A wholesale flip involves acquiring an interest in a property and then transferring that interest to a wholesale buyer who will, in turn, fix and flip the property.

Zurixx hosted free, live events that featured celebrities from house flipping and home renovation television programs, who indicate that their team will teach the consumer how to make money by following the celebrities' purported system of real estate investing. On numerous occasions during the free events, Zurixx taught consumers very little, if anything, about how to make profits investing in real estate. Instead, Zurixx repeatedly represented that consumers who sign up for its 3-day workshop would learn all they needed to know to earn thousands of dollars in profit, with little risk, time, or effort. Zurixx also represented that consumers who purchased the workshop would receive 100% funding for their real estate investments regardless of their credit history. Plaintiffs allege that these claims were false and unsubstantiated.

To further persuade consumers, Zurixx backed up its earnings and other representations

with a money-back guarantee–consumers who did not make a minimum of three times the price of the 3-day workshop within six months would receive their money back.  But Zurixx failed to disclose material conditions that Zurixx required consumers to meet in order to receive a refund of the money they paid for the workshop.  Zurixx also failed to disclose that consumers would be required to sign a settlement agreement with Zurixx that prohibited them from filing a complaint about Zurixx or its products with regulators or posting reviews on the internet.

At the 3-day workshops, Zurixx continued to represent that consumers were likely to make thousands of dollars in profit through real estate investing with little time and effort. Zurixx told customers at the workshops that they needed to purchase one of its three advanced packages in order to make thousands of dollars through real estate investing.  Zurixx told attendees that the retail price of the packages ranged from $35,972 to $73,973, but that those packages could be purchased at the workshop at discount prices ranging from $21,297 to $41,297.  Zurixx sold these advanced packages and related products, such as on-site mentoring or one-on-one telephone coaching with virtually the same misrepresentations it made at the free events.

At the 3-day workshops, Zurixx also routinely instructed consumers to contact credit card issuers in order to obtain new credit cards or increases in credit limits on existing cards based on their estimated or projected income as a result of the real estate investing they would be doing. Zurixx's presenters instructed workshop attendees to represent to credit card companies income that was significantly higher than the attendees' current income.  Zurixx had no reasonable basis for the earnings projections it instructed the attendees to submit to their credit card companies. In numerous instances, Zurixx told attendees to use the newly obtained credit to pay for Zurixx's

3

advanced packages.

The FTC and Division allege that the four corporate Defendants operated as a common enterprise while engaging in the unlawful conduct alleged in the Complaint. Consequently, the FTC and Division seek joint and several liability for the alleged unlawful conduct. The FTC and Division further allege that the individuals named as Defendants formulated, directed, controlled, or had the authority to control Zurixx's unlawful conduct. The Complaint asserts nine causes of action against all Defendants: deceptive practices in violation of Section 5 of the FTC Act in Counts One to Three for misrepresentations regarding earnings, misrepresentations regarding Zurixx's products or services, and failure to disclose material aspects of refund policy; violation of the Consumer Review Fairness Act in Count Four; deceptive acts or practices in violation of the Utah Consumer Sales Practices Act ("UCSPA") in Counts Five to Seven based on deceptive earnings claims, deceptive acts or practices with respect to products and serves, and failure to disclose material aspects of their refund policy; violations of the Utah Business Opportunities Act ("BODA") for failure to file required information with the Division and failure to provide required disclosures to prospective purchasers in Counts Eight and Nine.

## DISCUSSION

### Defendants' Partial Motion to Dismiss

Defendants' partial motion to dismiss seeks dismissal as to four issues: (1) whether the Federal Trade Commission ("FTC') can get an award of equitable monetary relief against Defendants under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) in Counts 1 through 3; (2) whether Defendants' services constitute a "business opportunity" under the Utah Business Opportunity Disclosure Act ("BODA") under Counts 8 and 9; (3) whether the Utah Division of

Consumer Protection ("the Division") can assert the state's regulatory power over Zurixx's activities in other states for purposes of Counts 5 through 9; and (4) whether the Division's request for disgorgement, civil penalties, and fines in Counts 5 through 9 is subject to the one-year limitations period set forth in Utah Code Ann. § 78B-2-302(3).

1. **Counts 1-3: Equitable Monetary Relief under Section 13(b) of the FTC Act**

The parties agree that the FTC can get injunctive relief for its claims in Counts One through Three under Section 13(b) of the FTC Act, but they dispute whether the FTC can obtain equitable monetary relief in connection with that injunctive relief under Section 13(b). 15 U.S.C. § 53(b). Section 13(b) of the FTC Act provides:

> Whenever the Commission has reason to believe–
>
> (1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and
>
> (2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public–
>
> the Commission by any of its attorneys designated by it for such purposes may bring suit in a district court of the United States to enjoin any such act or practice. Upon proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond; . . . *Provided, further*, That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction.

*Id.*

Defendants argue that the plain language of Section 13 of the FTC Act does not provide

5

the FTC with the authority to seek or obtain monetary relief, only preliminary or permanent injunctive relief. Section 13(b) only refers to injunctive relief.

In addition to arguing that the plain language of the FTC Act supports their position, Defendants rely on the Seventh Circuit's decision in *Federal Trade Commission v. Credit Bureau Ctr., Inc.*, 937 F.3d 764 (7th Cir. 2019). In *Credit Bureau*, the Seventh Circuit held that "section 13(b) does not authorize restitutionary relief." *Id.* In so holding, the Seventh Circuit overturned its own precedent, which it determined was predicated on abrogated Supreme Court precedent. *Id.* at 776-77. The court believed that its prior precedents were now in conflict with *Meghrig v. KFC Western, Inc.*, 516 U.S. 479 (1996), in which the Supreme Court refused to find implied restitutionary remedies in the Resource Conservation and Recovery Act of 1976 because of the statute's express inclusion of forward-facing remedies. *Id.* at 484-85. The *Credit Bureau* court explained that "[i]t is . . . an elemental canon of statutory construction that where a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies." *Credit Bureau*, 937 F.3d at 780.

The FTC, however, argues that Defendants ask the court to ignore binding Tenth Circuit precedent holding that Section 13(b) allows for equitable monetary relief. In *FTC v. Freecom Communications, Inc.*, 401 F.3d 1192 (10th Cir. 2005), the Tenth Circuit addressed the FTC Act's grant of authority to issue an injunction: "Although § 13(b) does not expressly authorize a court to grant consumer redress (i.e., refund restitution, rescission, or other equitable monetary relief), § 13(b)'s grant of authority to provide injunctive relief carries with it the full range of equitable remedies, including the power to grant consumer redress." *Id.* at 1202 n.6. The court further explained that "[i]n cases where the FTC seeks injunctive relief, courts deem any

monetary relief sought as incidental to injunctive relief." *Id.* The Tenth Circuit reiterated this holding in *FTC v. LoanPointe, LLC*, explaining that "a district court's authority to award disgorgement under § 13(b) falls within its general jurisdiction to 'decide all relevant matters in dispute and to award complete relief.'" 525 F. App'x 696, 699 (10th Cir. 2013).

Defendants argue that the Tenth Circuit reached its determination in *Freecom* by relying on *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989), the case that the Seventh Circuit overruled in *Credit Bureau*. But this assertion is incorrect. Neither *Freecom* nor *LoanPointe* cite *Amy Travel* to determine that Section 13(b) authorizes monetary relief. The Tenth Circuit relied on decisions from the Supreme Court and from the Second, Ninth, and Eleventh Circuits, which have not been overruled. *Freecom*, 401 F.3d at 1202 n.6; *LoanPointe*, 525 Fed. App'x at 699. Until *Credit Bureau*, every court of appeals that considered whether Section 13(b) authorizes monetary relief agreed that it did. The Seventh Circuit's decision in *Credit Bureau*, not only reversed its own precedents, but departed from a consensus of other circuit court decisions.

The Tenth Circuit has rejected the reasoning and interpretations of precedent that the Seventh Circuit panel adopted in *Credit Bureau*. In *Credit Bureau*, the court departed from nearly forty years of consensus based on the Supreme Court's decision in *Meghrig*–itself issued 23 years earlier– which the court found "displaces the rationale of our precedent." 937 F.3d at 781. The *Credit Bureau* court stated that "[s]ince *Meghrig*, the [Supreme] Court has adhered to [a] more limited understanding of judicially implied remedies." *Id.* The Seventh Circuit reasoned that "[w]hatever strength" the Supreme Court's prior cases in *"Porter* and *Mitchell* retain, *Meghrig* clarifies that they cannot be used as . . . a license to categorically recognize all ancillary forms of equitable relief without a close analysis of statutory text and structure." *Id.* at

7

782.

Although the Seventh Circuit stated that "most circuits adopted their positions by uncritically accepting [its] holding in *Amy Travel*," *Amy Travel* was not the genesis for the long line of appellate decisions holding that Section 13(b) authorizes equitable monetary relief. *Id.* at 779, 785. Rather, decisions from the Eleventh and Ninth Circuits, each engaging in an in-depth analysis of Section 13(b) and principles of equity jurisdiction, predated and were cited by *Amy Travel*. *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434-35 (11th Cir. 1984); *FTC v. H.N. Singer, Inc.,* 668 F.2d 1107, 1112-13 (9th Cir. 1982). These decisions as well as *Freecom* and *LoanPointe*, are rooted in the principles expressed by the Supreme Court in *Porter v. Warner Holding Co.*, 328 U.S. 395, 399 (1946). In *Porter*, the Court held that when a statute authorizes the district court to issue an injunction, the court may exercise "all the inherent equitable powers" necessary for "the proper and complete exercise of that jurisdiction," including the award of monetary relief. *Id.* at 397-99. *Porter* held that "[n]othing is more clearly a part of the subject matter of a suit for an injunction than the recovery of that which has been illegally acquired and which has given rise to the necessity for injunctive relief." *Id.* at 399. The Supreme Court later emphasized that when Congress grants a court the power to issue an injunction, it "must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes." *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291-92 (1960). The Supreme Court also cited *Porter* for the principle that "[w]hen federal law is at issue and 'the public interest is involved,' a federal court's 'equitable powers assume an even broader and more flexible character than when only a private controversy is at stake,'" including the power to "'accord full justice' to all parties." *Kansas v. Nebraska*, 135 S. Ct. 1042, 1053 (2015) (quoting

*Porter*, 328 U.S. at 398).

In *United States v. RxDepot, Inc.*, 438 F.3d 1052 (10th Cir. 2006), the Tenth Circuit applied the interpretive framework set forth in *Porter* and *Mitchell* to determine whether Section 332(a) of the Federal Food, Drug and Cosmetics Act ("FDCPA") authorized equitable monetary relief because it grants courts "jurisdiction to restrain violations" of the FDCPA. *Id.* at 1055. The Tenth Circuit explained that "under *Porter* and *Mitchell*, when a statute invokes general equity jurisdiction, courts are permitted to utilize any equitable remedy to further the purposes of the statute absent clear legislative command or necessary and inescapable inference restricting the remedies available." *Id.* The presumption this principle dictates is clear: Once general equity jurisdiction is invoked, all equitable remedies are presumed, unless there is clear legislative command to the contrary.

Particularly relevant here is that the Tenth Circuit in *Rx Depot* explicitly rejected the contention that *Meghrig* changed the *Porter/Mitchell* analysis. Rather, the Tenth Circuit found that *Meghrig* "merely identified . . . a statute that fit into the exceptions recognized by *Porter* and *Mitchell*." 438 F.3d at 1055-57 & n.3. Moreover, *Meghrig* involved a private citizen seeking restitution in a dispute between private parties, not a government enforcer suing to vindicate public harm under a statute designed to protect the public interest. The Tenth Circuit relied on this public-private distinction in distinguishing *Meghrig* in *Rx Depot*. *Id.* at 1056-57.

The cases Defendants cite as corroborating the purported interpretive change that *Meghrig* represents are inapplicable to Section 13(b). They involve different operative language, address the breadth of a given civil or criminal statute, or determine the availability of implied rights of action rather than remedies. Both the Supreme Court and the Tenth Circuit recognize

this analytical distinction.

In reaffirming the interpretive strictures of *Porter* and *Mitchell*, *Rx Depot* reconciled the statutory construction principles applicable when determining equitable remedies. *Rx Depot* provides six guideposts for an appropriate analysis. First, monetary relief under Section 13(b) must be considered in conjunction with monetary relief authorized by other sections of the FTC Act. *Id.* at 1055. Second, the lack of broadening language authorizing equitable remedies at large is not required. *Id.* Third, the court rejected Defendants' assertion that authorizing equitable monetary relief when a statute specifies an injunction would be implying a remedy. *Id.* at 1059. Fourth, *Rx Depot* rejected Defendants' assertion that *Meghrig* limits equitable relief to prospective remedies only: *Meghrig* "did not explicitly overrule *Mitchell*'s holding that backward-looking remedies are permitted under a grant of authority to restrain violations." *Id.* at 1058. Fifth, the court reiterated that "'equitable powers assume even broader and more flexible character' in suits involving the public interest" such as "an enforcement action by the government to protect the public." *Id.* at 1057. Sixth, the court also made clear that just because a statutory scheme specifies restitution through an administrative process does not mean Congress intended to foreclose or limit equitable relief by other means. The FDCA allows restitution for certain medical devices as part of an administrative process subject to specified prerequisites, yet the Tenth Circuit held that the granting of expanded administrative powers did not diminish the federal courts' judicial powers under a grant of general equity jurisdiction.

Applying these principles, the Tenth Circuit found that Section 332(a) invokes equity jurisdiction, disgorgement is a traditional equitable remedy, the FDCA does not clearly preclude disgorgement, and disgorgement is not inconsistent with the FDCA's purpose of protecting the

10

public health. *Id.* at 1058, 1061. This analysis applies equally to Section 13(b) of the FTC Act, which is similarly another public interest statute enforced by the government. Section 13(b) has analogous operative language granting the FTC and the courts injunction authority.

The equitable monetary relief under Section 13(b) is part of a multi-path enforcement structure provided in the FTC Act. Congress created multiple enforcement options in the FTC Act. Section 19 was created two years after Section 13(b) and contains a savings clause unambiguously stating that remedies under Section 19 are "[i]n addition to, and not in lieu of other remedies, and that "[n]othing in this section shall be construed to affect any authority of the Commission under any other provision of law." 15 U.S.C. § 57b(e). Sections 13(b) and 19 coexist because they provide alternative methods of enforcing substantive law violations, one of which is an administrative process with ancillary judicial support and the other is purely judicial. There is a role for each type of proceeding. However, the two sections do not diminish the power in the other section.

The remedies for each section of the FTC Act also differ. Unlike Section 13(b), whose remedies are solely equitable, Section 19 authorizes equitable remedies as well as "payment of damages," which is a legal remedy unavailable under Section 13(b). 15 U.S.C. § 57b(b). Thus, Sections 13(b) and 19 authorize distinct types of relief and alternative procedures for achieving them depending on the FTC's enforcement goals. These differences are not nullified by the availability of monetary relief under both sections.

After Section 19 was enacted in 1975, Congress has twice ratified the FTC's authority to obtain equitable monetary relief under Section 13(b). In 1994, years after courts recognized the availability of such relief, Congress expanded the statute's venue and service of process

11

provisions. As it amended Section 13(b), Congress let stand the many existing judicial decisions allowing monetary relief under the statute. When Congress amends a statute but retains certain statutory language that courts have interpreted in a particular way, Congress is deemed to have accepted and ratified that judicial interpretation. *Texas Dep't of Hous. & Comty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2520 (2015).

In 2006, Congress codified the existing judicial understanding of Section 13(b) when it enacted the U.S. Safe Web Act of 2006, Pub. L. No. 109-455, 120 Stat. 3372 (Dec. 22, 2006). Congress expanded the FTC's enforcement authority against certain practices abroad by adding a new provision to Section 5, stating: "All remedies available to the Commission with respect to unfair and deceptive acts or practices shall be available for acts and practices described in this paragraph, including restitution to domestic or foreign victims." 15 U.S.C. § 45(a)(4)(B). Here too, Congress would have known about the consensus of appellate decisions permitting equitable monetary relief under Section 13(b).

While the Supreme Court could adopt the Seventh Circuit's view of Section 13(b), the court feels bound by the controlling Tenth Circuit case law as well as the structure of the FTC Act and longstanding principles of equity jurisprudence. Accordingly, the court concludes that Section 13(b) of the FTC Act provides for equitable monetary relief. Therefore, the court denies Defendants' motion to dismiss based on these grounds.

**2. Counts VIII and IX – Business Opportunity under BODA**

Defendants argue that the Division's claims under BODA fail to allege any facts demonstrating that the Defendants offer Utah consumers a "business opportunity." Under Utah law, a business is subject to BODA if it offers consumers an "assisted marketing plan." Utah

12

Code Ann. § 13-15-4. An "assisted marketing plan" is defined as the "sale or lease of any products, equipment, supplies, or services that are sold to the purchaser upon payment of an initial required consideration of $500 or more for the purpose of enabling the purchaser to start a business, and in which the seller" makes one or more of the four representations listed in BODA. *Id.* § 13-15-2(1)(a). In this case, the Division relies on only one of the four listed representations: "that upon payment by the purchaser of a fee or sum of money, which exceeds $500 to the seller, the seller will provide a sales program or marketing program that will enable the purchaser to derive income from the assisted marketing plan that exceeds the price paid for the marketing plan." *Id.* § 13-15-2(1)(a)(iv).

Defendants contend that the Complaint does not sufficiently allege that Zurixx's educational content qualifies as an "assisted marketing plan." However, the Complaint alleges that Zurixx teaches its consumers how to use Zurixx's real estate investing system and the system purports to include more than just education. In addition to experts who will teach them how to make money by following their system of real estate investing, Zurixx claims to include software, access to financing and lenders who will provide 100% funding for the consumers' real estate deals, and hands-on help in finding and flipping (or otherwise monetizing) real estate. Zurixx tells consumers they will not have to use any of their own money because they will be using "other people's money." It also sells consumers access to "turn-key" properties and an online resource center. These resources are more than mere education.

In *Roberts v. C.R. England, Inc.*, this court endeavored to give the terms "marketing sales program" their ordinary and usually accepted meanings because the terms are not defined in BODA. 318 F.R.D. 457, 496 (D. Utah 2017). The court explained that "[m]arketing is often

defined as the 'act or process of promoting and selling, leasing, or licensing products or services,' or alternatively, as the 'part of a business concerned with meeting customers' needs." *Id.* (citation omitted). Furthermore, "[t]he noun 'sales' is used to refer to 'operations and activities involved in promoting and selling goods or services,' or, as an adjective, to connote 'of, relating to, or used in selling.'" *Id.* (citation omitted). And, the term "'program' has been defined as 'a plan or system under which action may be taken toward a goal.'" *Id.* (citation omitted).

In *Federal Trade Commission v. Nudge, LLC*, 2:19-CV-867-RJS, 2019 WL 7398678 (D. Utah Dec. 31, 2019), the court defined the "services" as used in BODA to "refer to 'labor performed in the interest or under the direction of others; specifically, the performance of some useful act or series of acts for the benefit of another, usually for a fee.'" *Id.* at *10 (citation omitted). "'In this sense, service denotes an intangible commodity in the form of human effort, such as labor, skill, or advice.'" *Id.* (citation omitted). Also, the term "'product' is generally 'something that is distributed commercially for use or consumption.'" *Id.* (citation omitted).

The similarities between the allegations in this case and *Nudge* are striking. As in *Nudge*, the education, training, and resources Zurixx offers can be considered a service under BODA. *See id.* In addition, the Complaint alleges sufficient facts to find that Zurixx purported to give consumers who purchased various resources a sales program enabling them to successfully buy and sell real estate. *Id.* at *11. In *Nudge*, the court concluded that "[t]he training combined with access to funding, buyers, and properties meets the definition of 'sales program' under BODA." *Id.* The Complaint also sufficiently alleges that Zurixx charged more than $500 for the program, given that the three-day workshop costed $1,997 and the additional training workshops costed up to $41,297. Utah Code Ann. § 13-15-2(1)(a). BODA does not require that Zurixx enable

14

students to start a new sales or marketing program. It requires Zurixx to sell an assisted marketing plan to enable the consumer to start a business of any kind and to derive income from that business. Utah Code Ann. § 13-15-2(1)(a)(iv).

Zurixx claims that it falls within an exclusion in BODA because it complies with the FTC Business Opportunity Rule. However, there is no evidence before the court that Zurixx complies with the FTC rule. Plaintiffs assert that Zurixx does not comply with the FTC rules governing business opportunity ventures because it does not provide consumers with a disclosure document as would be required by 16 U.S.C. § 437.3. Nor does Zurixx provide an earnings claim statement as required by 16 U.S.C. § 437.4. In addition, the exclusion is not applicable because BODA requires a seller claiming the exemption to file with the Division a Notice of Exemption Filing. Utah Code Ann. § 13-15-4.5. Plaintiffs assert that Zurixx has not filed such a notice, and ZUrixx did not file such a notice with the court.

Moreover, the FTC's Business Opportunity Rule simply does not apply in this case. The Division brought a claim under BODA; the FTC did not bring a claim under its Business Opportunity Rule. BODA and the Business Opportunity Rule are not identical. The scope of the laws differs. There is nothing improper about BODA providing protection to consumers that may not be covered by the Business Opportunity Rule. Zurixx can violate BODA whether or not it also violates the Business Opportunity Rule.

Accordingly, the court denies Defendant's motion to dismiss the Division's claims under BODA in Counts VIII and IX for failing to allege sufficient facts to support a finding that Zurixx's offers consumers an assisted marketing plan.

3. **Counts V-IX: Activities Outside Utah**

Defendants argue that Counts V through IX must be limited to alleged harm to Utah consumers because the Utah Department of Consumer Protection does not have the authority to seek injunctive relief, monetary relief, or financial penalties for activities that occurred outside of Utah. Defendants contend that the Complaint does not specify any conduct that occurred in Utah. Plaintiffs, however, argue that few, if any, of Zurixx's transactions with consumers occur wholly outside of Utah.

The Complaint alleges that each corporate Defendant's principal place of business is Utah. The Complaint also alleges that Zurixx pitches its services, in part, through its telemarketers located in Utah, who call Zurixx consumers who have previously been involved in Zurixx programs and introduces them to new products they could buy. The Complaint further alleges that numerous consumers have paid thousands of dollars for the additional one-on-one coaching and mentoring programs which often occurs on telephone calls from Utah. In addition, the Complaint alleges that, contrary to Zurixx's representations, the consumers who purchase its one-on-one coaching or mentoring program are not likely to make thousands of dollars in profit.

The Utah Legislature statutorily authorized the Division to bring cases enforcing Utah's consumer protection laws. That authorization specifically states that the Division has jurisdiction over sales to consumers in other states, so long as part of the transaction occurs in Utah, or Utah transactional resources are used (such as telephones, the mail, bank accounts, internet). Utah Code Ann. § 13-2-6. The Complaint alleges that transactions occurred in Utah and/or that transactional resources in Utah were used. Zurixx is asking the court to ignore that each of the consumer transactions originates in Utah and many are inextricably intertwined with Utah. The facts alleged are sufficient to support an inference at the motion to dismiss stage that the Division

has authority over Zurixx under § 13-2-6(4).

Zurixx's position that Utah law is designed only to protect Utah consumers cites the statute that creates, not the Division of Consumer Protection, but the Department of Commerce, of which the Division is a part. In the section relied on by Zurixx, the Legislature expressed its intention to protect Utah's citizens. But, for purposes of Defendants' argument regarding extraterritoriality, the more specific language of § 13-2-6(4) prevails over the Department of Commerce's general intent language. Moreover, the two statutes are not in actual conflict.

The Division's authority to regulate the actions of businesses located here so long as the consumer transaction does not take place wholly outside Utah is consistent with constitutional principles. Utah Code Ann. § 13-2-6(4); *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). "[T]he 'Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.'" *Healy*, 491 U.S. 324, 336 (1989). Factually, however, in this case, there are allegations in the Complaint demonstrating that the commerce at issue takes place, in part, in Utah. Those allegations are sufficient to withstand a motion to dismiss.

Furthermore, the Division's actions even-handedly regulate commerce. State regulators may not discriminate against interstate commerce and may not impose undue burdens on interstate commerce. But, state laws that "regulate even-handedly to effectuate a legitimate local public interest will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2091 (2018). Utah has a legitimate public interest in enforcing its consumer protection laws against companies with their base of operations here and Zurixx has not pointed to any burden imposed

17

upon it by being regulated by its home state, let alone a burden that is clearly excessive. Zurixx's complaint about having to comply with different deadlines in different states is a common requirement for companies that operate in multiple states.

Therefore, the court rejects Zurixx's contention that the Complaint fails to allege any conduct in Utah subject to the Division's regulatory power. Accordingly, the court denies Defendants' motion to dismiss Counts V through IX on that basis.

**4. Counts V-IX: Statute of Limitations**

Defendants argue that the Division is barred from seeking disgorgement, civil penalties, and fines for all alleged conduct that occurred outside the one-year statute of limitations in Utah Code Ann. § 78B-2-302(3). Section 78B-2-302(3) establishes a one-year statute of limitations for actions "upon a statute . . . for a forfeiture or penalty to the state." Utah Code Ann. § 78B-2-302(3). However, it is premature at this stage of the proceedings for the court to undertake a factual analysis to determine if disgorgement or any other remedy is limited. The Division argues that the nature of disgorgement in a Division action under the CSPA is remedial, not punitive. Any analysis of the nature of whether disgorgement is remedial or punitive is a factual matter, and not the proper subject of a motion to dismiss.

Furthermore, Zurixx does not argue any claim is barred entirely by any relevant statute of limitations. Zurixx's partial motion to dismiss based on the statute of limitations does not seek to dismiss claims in their entirety, but rather goes to the extent of relief available. "Rule 12(b)(6) is an improper procedural vehicle for such a challenge." *Nudge*, 2019 WL 7398678, at *12. "As many courts have recognized, parties may not use rule 12(b)(6) to dismiss only parts of a claim. . . . '[T]he question at this stage is simply whether the complaint includes factual allegations that

18

state a plausible claim for relief.'" *Id.* (citations omitted). Accordingly, the court denies Defendants' motion to dismiss based on the statute of limitations.

CONCLUSION

Based on the above reasoning, Defendants Zurixx, LLC, Carlson Development Group, LLC, CJ Seminar Holdings, LLC, Zurixx Financial, LLC, Christopher A. Cannon, James M. Carlson, and Jeffrey D. Spangler's Partial Motion to Dismiss [ECF No. 62] is DENIED.[1]

DATED this 26th day of February, 2020.

BY THE COURT:

_____
DALE A. KIMBALL,
United States District Judge

---

[1] At the hearing on the motion to dismiss, Defendants asked the court to stay its ruling if the court was inclined to rule against them because of other cases working their way through the federal courts. However, Defendants did not formally file a motion to stay, and the court declines to stay a ruling on a motion Defendants themselves brought based on other cases that may or may not be relevant to the issues before this court.