### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **FEDERAL TRADE COMMISSION and UTAH DIVISION OF CONSUMER PROTECTION,** | **MEMORANDUM DECISION AND ORDER** |
| **Plaintiffs,** | Case No. 2:19-cv-713-DAK-DAO |
| vs. | Judge Dale A. Kimball |
| **ZURIXX, LLC, et al.,** | Magistrate Judge Daphne A. Oberg |
| **Defendants.** | |

This matter is before the court on Zurixx, LLC, Carlson Development Group, LLC, CJ Seminar Holdings, LLC, Zurixx Financial, LLC, Christopher A. Cannon, James M. Carlson, and Jeffrey D. Spangler's ("Zurixx Defendants") Motion to Modify Preliminary Injunction Order [ECF No. 244], the Zurixx Defendants' Motion for Partial Summary Judgment As To Relief Under Section 13(b) and BODA [ECF No. 245], Defendants JSS Investment Ventures, JSS Trust, Gerald D. Spangler, and Stephenie Spangler's ("Spangler Defendants") Motion for Partial Summary Judgment [ECF No. 257], and Relief Defendant Stephenie Spangler's Motion for Summary Judgment [ECF No. 259].   On October 6, 2021, the court held a hearing on these motions by Zoom videoconferencing due to the Covid-19 pandemic.   At the hearing, the Federal Trade Commission ("FTC") was represented by Amanda R. Grier, Joshua A. Doan, Roberto Anguizola, the Utah Division of Consumer Protection was represented by Thomas M. Melton and Robert G. Wing, the Zurixx Defendants were represented by Eric G. Benson, Z. Ryan Pahnke, and D. Loren Washburn, and the Spangler Defendants were represented by Brennan H. Moss.   The

court took the motions under advisement.   After carefully considering the parties' memoranda and the law and facts relevant to the motions, the court issues the following Memorandum Decision and Order on the pending motions.

## BACKGROUND

On September 30, 2019, the Federal Trade Commission ("FTC") and the Utah Division of Consumer Protection ("UDCP') filed the original Complaint in this action along with a Motion for *Ex Parte* Temporary Restraining Order.   On October 1, 2019, the court entered an *Ex* Parte Temporary Restraining Order with Asset Preservation, Appointment of Temporary Monitor Over Corporate Defendants, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue.   The court's order granted Plaintiffs' Temporary Restraining Order pursuant to the FTC's claims under Section 13(b) of the FTC Act and the UDCP's claims under Utah Code §§ 13-11-17(1)(b), 13-11-2(4), 13-15-3(1), and 13-2-5(3).   A month later, under this same authority, the court entered a Preliminary Injunction stipulated to by the parties.   The stipulated Preliminary Injunction froze the corporate Zurixx Defendants' assets and appointed a Receiver over the corporate Zurixx Defendants' assets and operations.   The Zurixx Defendants consented to the entry of the stipulated Preliminary Injunction but reserved all rights to contest or challenge the Plaintiffs' authority to seek any further relief.

Approximately six months later, on May 12, 2020, Plaintiffs filed their First Amended Complaint adding violations of the Telemarketing Sales Rule ("TSR"), 15 U.S.C.A.§§ 6102, 6105(b).   The remedies and relief for violations of the TSR are those provided in the FTC Act. Therefore, the FTC claimed relief for Defendants' alleged TSR violations under Section 13(b) of the FTC Act, which applies to violations of any provision enforced by the FTC, and under Section 19 of the FTC Act, for rescission or reformation of contracts, the refund of money or return of

2

property, damages, and such relief as the court finds necessary to redress injury to consumers.

The parties did not stipulate to a revised Preliminary Injunction listing the alleged TSR violations as a basis for the previously issued preliminary injunction in this case.   The Zurixx Defendants, moved to stay the action based on the pendency of a case challenging the available damages under Section 13(b).   Based on controlling Tenth Circuit law at the time, the court denied that motion to stay.

On April 22, 2021, the Supreme Court issued its decision in *AMG Capital Management, LLC v. FTC*, 141 S. Ct. 1341 (2021), determining that Section 13(b) of the FTC Act does not grant the FTC authority to obtain equitable monetary relief.   *Id.* at 1352.   This was a significant change in the way lower courts had applied the statute and overruled the Tenth Circuit case law upon which this court had previously relied.   In making its determination, the Supreme Court looked at how the FTC's authority has evolved over time, the language and structure of Section 13(b), and the entire enforcement scheme set out in the FTC Act.   *Id.* at 1346-52.

Before analyzing the specific statutory language in the FTC Act, the court provided some historical context, explaining that since its creation in 1914, the FTC "has been authorized to enforce the Act through its own administrative proceedings."   *Id.* at 1346.   Section 5 of the FTC Act "describes the relevant administrative proceedings" for determining whether a party has violated the FTC Act.   *Id.*   In the 1970s, however, Congress "authorized the Commission to seek additional remedies in court" through the addition of Section 13(b), which allows a court to grant injunctive relief, and Section 19, which allows a court to grant relief to redress injury when the FTC has issued a final cease and desist order.   *Id.*   Over time, the FTC began using Section 13(b)'s injunctive language to obtain equitable monetary relief directly in court without the prior use of traditional administrative proceedings.   *Id.* at 1346-47.   As a result, the FTC began

bringing far more cases in court than it does in the administrative process.   *Id.* at 1347.

Once the *AMG* Court reached its analysis of the statutory language, it pointed out that Section 13(b)'s language "refers only to injunctions," that an injunction "is not the same as an award of equitable monetary relief," and that, "taken as a whole," Section 13(b)'s injunctive language "focuses purely on [prospective] injunctive, not [retrospective] monetary, relief."   *Id.* at 1348.   The Court explained that Section 13(b)'s "words reflect that the provision addresses a specific problem, namely, that of stopping seemingly unfair practices from taking place while the Commission determines their lawfulness."   *Id.* "But to read those words as allowing what they do not say, namely, as allowing the Commission to dispense with administrative proceedings to obtain monetary relief as well, is to read the words as going well beyond the provision's subject matter." *Id.*

The Court then considered "the structure of the Act beyond § 13(b)."   *Id.*   The Court explained that "Congress, in § 5(*l*) and § 19, gave district courts the authority to impose limited monetary penalties and to award monetary relief in cases where the Commission has *issued cease and desist orders*, *i.e.*, where the Commission has engaged in administrative proceedings."   *Id.* at 1349.   These other provisions provide for the refund of money or return of property, and other and further equitable relief.   Because Congress explicitly provided for these remedies, the Court found "it likely did not intend for § 13(b)'s more cabined 'permanent injunction' language to have similarly broad scope."   *Id.*   Moreover, Congress included "certain important limitations" on Section 19 damages that are absent in Section 13(b).   *Id.*   Given that "Congress enacted these other, more limited, monetary relief provisions . . . a few years after it enacted § 13(b)," "[i]t is highly unlikely that Congress would have enacted provisions expressly authorizing *conditioned* and *limited* monetary relief if the Act, via § 13(b), had already implicitly allowed the Commission

to obtain that same monetary relief and more without satisfying those conditions and limitations." *Id.*

The court further determined that "to read § 13(b) to mean what it says, as authorizing injunctive but not monetary relief, produces a coherent enforcement scheme: The Commission may obtain monetary relief by first invoking its administrative procedures and then § 19's redress provisions (which include limitations).   And the Commission may use § 13(b) to obtain injunctive relief while administrative proceedings are foreseen or in progress, or when it seeks only injunctive relief."   *Id.*   The Court, therefore, rejected the FTC's argument that Congress created two separate, parallel enforcement avenues—one administrative, and one judicial—for the FTC to choose between.   *Id.* at 1350-51.

In further rejecting the FTC's argument that its use of Section 13(b) to obtain monetary relief allowed it to return more ill-gained profits to injured consumers, the Court recognized that nothing in its decision prohibits the FTC "from using its authority under § 5 and § 19 to obtain restitution on behalf of consumers."   *Id.* at 1351-52.   But "as currently written," Section 13(b) does not grant the FTC "authority to obtain equitable monetary relief."   *Id.* at 1352.

After the Supreme Court issued its decision in *AMG*, this court requested that the parties submit briefing as to its impact on this case and the ancillary receivership cases.   In addition to submitting that briefing, the Defendants brought the motions presently pending before the court.

## DISCUSSION

Based on the United States Supreme Court's decision in *AMG Capital Management, LLC v. FTC*, 141 S. Ct. 1341 (2021), that Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), does not grant the FTC authority to obtain equitable monetary relief, the Zurixx Defendants brought a Motion to Modify Preliminary Injunction Order and a Motion for Partial Summary Judgment as to

Relief Under Section 13(b) and BODA, the Spangler Defendants brought a Motion for Partial Summary Judgment and joined the Zurixx Defendants' Motion for Partial Summary Judgment, and Relief Defendant Stephenie Spangler brought a Motion for Summary Judgment.

### Defendants' Motion to Modify Preliminary Injunction

Based on the Supreme Court's *AMG* decision, the Zurixx Defendants ask the court to modify the stipulated Preliminary Injunction by lifting the asset freeze and discontinuing the receivership.   The Zurixx Defendants recognize that *AMG* did not strike down the FTC's ability to obtain a prospective preliminary injunction under Section 13(b), but they request that the court strike the Preliminary Injunction's retroactive relief provisions.   The FTC opposes any modification of the Preliminary Injunction, arguing that the damages available to it under Section 19 of the FTC Act in relation to its TSR claim support continuation of the asset freeze and receivership.   The Division similarly contends that its state law claims remain unchanged by *AMG* and those claims support the existing Preliminary Injunction.

The court has broad discretion to modify or vacate a preliminary injunction and may do so "in light of subsequent changes in the facts or law or for any other good reason."   *Basic Research LLC v. Cytodyne Techs., Inc.*, 2000 WL 33363261, at *11 (D. Utah Dec. 20, 2000).   In the court's November 24, 2020 Memorandum Decision and Order denying a motion to stay pending the decision in *AMG*, the court recognized that the Preliminary Injunction, by its very title, is not a final order and Rule 54(b) of the Federal Rules of Civil Procedure provides that "any order or other decision, however designated, that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment adjudicating all the claims and the parties' rights and liabilities."   Fed. R. Civ. P. 54(b).

The Zurixx Defendants contend that because the TRO and Preliminary Injunction in this

case were based principally on the FTC's ability, under then-existing law, to obtain equitable monetary relief under Section 13(b), and that equitable monetary relief is no longer available under that provision, there is no longer any basis for freezing Defendants' assets and no longer any need for the Receiver to manage or preserve those funds.   However, as Plaintiffs assert, the FTC still has a claim for damages under Section 19 of the FTC Act in relation to its TSR claims and the Division has claims for damages under its state law claims.   Plaintiffs argue that the receivership and asset freeze provisions remain lawful and necessary to preserve evidence and assets for consumer redress under Section 19 of the FTC Act and the Utah state claims.

The Preliminary Injunction specifically mentioned the state law claims as a basis for the injunction.   However, it did not reference the FTC's TSR claims or Section 19 because the TSR claims were not a part of the case at the time.   The FTC added the TSR claims in its First Amended Complaint, which it filed approximately six months after the court entered the stipulated Preliminary Injunction.   While the Zurixx Defendants contend that Plaintiffs cannot rely on the TSR claims and damages under Section 19 to support the Preliminary Injunction because they are not mentioned in the Preliminary Injunction, the court is willing to consider whether those claims and damages, which are now part of the case, support the continuation of the Preliminary Injunction.   If the court can modify provisions of the Preliminary Injunction in favor of Defendants based on subsequent changes, it can modify provisions of it in favor of Plaintiffs as well.

Even if the court is willing to consider whether Section 19 and the Utah state law claims support the continuation of the Preliminary Injunction, the Zurixx Defendants argue that a preliminary injunction is not warranted based on those claims.   The Zurixx Defendants argued in its opening briefing that the FTC could not bring its TSR claims in this court under Section 19

without a prior cease and desist order from the agency.   However, the FTC's TSR claims are

brought under Section 19(a)(1), which permits a court in the first instance to resolve alleged rule

violations.   15 U.S.C.A. § 57b(a)(1).   Section 19(a)(1) does not require a previous cease and

desist order from the agency.   *Id.*   The FTC does not assert its TSR claims under Section

19(a)(2), which relates to administrative adjudication and requires an agency to issue a

cease-and-desist order before a claim is brought in court.   *Id.* § 57b(a)(2).   Therefore, the FTC

properly asserted its Section 19(a)(1) claims in this court in the first instance and did not need an

agency cease and desist order before bringing the claims.

The Zurixx Defendants also argue that the FTC cannot demonstrate a likelihood of success

on the merits with respect to damages under the TSR claims.   However, the likelihood of success

element more properly relates to the FTC's ability to prove liability for its claims.   The FTC has

provided evidence that the Zurixx Defendants' business model injured consumers at in-person

seminars and through telesales by the use of false and misleading representations regarding the

nature of the products the consumer was paying to receive and the potential earnings the consumer

could expect based on the product Zurixx was selling. The FTC has recordings of telesales

involving these misrepresentations.

Furthermore, *AMG* did not alter the FTC's right to an injunction under Section 13(b) to

prevent violations of the FTC Act, it merely precluded the FTC from seeking, and a court from

awarding, equitable monetary relief under Section 13(b) prior to agency proceedings.   The FTC

has submitted evidence that it is likely to succeed on its request for an injunction under Section

13(b) and its request for consumer redress under Section 19 with respect to its TSR violation

claims.   The Zurixx Defendants claim that the damages available under Section 19 do not support

an asset freeze and receivership is more properly discussed in terms of the proper parameters of the preliminary injunction under the balancing of equities and public interest considerations.

The parties do not address the irreparable harm element for a traditional preliminary injunction presumably because the FTC Act does not require the FTC to demonstrate irreparable harm to obtain an injunction under Section 13(b).   Section 13(b) of the FTC Act allows for a preliminary injunction "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such an action would be in the public interest." 15 U.S.C. § 53(b).   Although there is no specific Tenth Circuit law holding that the FTC has a lighter burden than a private litigant in obtaining a preliminary injunction, the Ninth and Eleventh Circuits have recognized that the FTC does not need to demonstrate irreparable harm.   *FTC v. Consumer Defense, LLC*, 926 F.3d 1208, 1212 (9th Cir. 2019) (finding that Section 13(b) "places a lighter burden on the Commission than that imposed on private litigants by the traditional equity standard; the Commission need not show irreparable harm to obtain a preliminary injunction."); *FTC v. Acquinity Interactive, LLC*, 2021 WL 3603594, at *2 (S.D. Fla. Aug. 13, 2021) (relying on *FTC v. University Health, Inc.*, 938 F.2d 1206, 1217-18 (11th Cir. 1991).

Typically, under Tenth Circuit law, "[c]ourts may presume irreparable harm only when a party is seeking an injunction under a statute that *mandates* injunctive relief as a remedy for a violation of the statute. . . . When, by contrast, a statute merely *authorizes* injunctive relief, courts may not presume irreparable harm, as doing so would be 'contrary to traditional equitable principles.'" *First Western Management Co. v. Malamed*, 874 F.3d 1136, 1140 (10th Cir. 2017) (quoting *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016)).   By using the term "may," the language of Section 13(b) authorizes, but does not mandate, injunctive relief.   However, in *Fish v. Kobach*, 840 F.3d 710, (10th Cir. 2016), where the court required a finding of irreparable harm

9

because the statute did not mandate an injunction, the Tenth Circuit recognized that the finding of irreparable harm was necessary because there was "no indication in the [Act]'s text that Congress intended to constrain or otherwise guide the traditional exercise of equitable jurisdiction in weighing whether an injunction should issue." *Id.* at 751 n.24.   The FTC Act may use permissive language, but it contains clear language that "otherwise guides" the court as to the necessary standards for injunctive relief.   Congress has clearly provided the standard it intends the courts to use in determining whether to issue an injunction and, in so doing, Congress appears to have removed the irreparable harm requirement.   See 15 U.S.C. § 53(b).   Because neither party has raised any issue regarding irreparable harm, in determining the proper scope of the Preliminary Injunction, the court will apply the injunction standard provided in Section 13(b), which requires a proper showing that, weighing the equities and considering the FTC's likelihood of ultimate success, and the injunction is in the public interest.

The Court recognizes that potential damages under Section 19 and the state law claims are a significant consideration in determining whether the balance of equities and public interest support an asset freeze and receivership as part of the Preliminary Injunction.   The FTC contends that the damages for TSR violations under Section 19 support a continuation of the Preliminary Injunction as originally stipulated to by the parties and issued by the court.   Section 19(a)(1) of the FTC Act, which addresses suits for rule violations, allows the FTC to bring suit for relief under Section 19(b).   15 U.S.C. § 57b(a)(1).   Section 19(b) gives a court jurisdiction to grant "such relief as the court finds necessary to redress injury to consumers . . . resulting from the rule violation." *Id.* § 57b(b).   "Such relief may include, but shall not be limited to, recission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting the rule violation." *Id.*   Section 19 also contains a three-year

10

statute of limitations, which significantly reduces the damages that were previously available under Section 13(b).  *Id.* § 57b(d).

In this case, the FTC alleges that Zurixx's gross revenues from its real estate services sales were $530 million, with $136 million of that coming from telemarketing sales, and $68.2 million of those telemarketing sales occurring within the three years prior to the FTC's filing of the original Complaint.   Despite these substantial revenue figures, the Receiver currently holds only $7.3 million in funds.   Zurixx and Dorado paid out $78.4 million in owner distributions, but Defendants self-report approximately $24.3 million in combined assets and $5.7 million in liabilities.   Based on the small fraction of revenues remaining, the FTC argues that there continues to be a need for the Preliminary Injunction because of a strong likelihood that Defendants will dissipate assets absent an asset freeze and receivership and be unable to pay a potential judgment.

The Zurixx Defendants dispute the damage figures the FTC alleges are at issue and argue that the reduced amount of damages at issue under Section 19 do not justify an asset freeze and receivership.   First, the Zurixx Defendants contend that the damages are reduced because Section 19's three-year statute of limitations should run from the date the FTC amended its Complaint to add the TSR claims, not the date of the original Complaint.   If telesales revenues are calculated from the time of the First Amended Complaint, they amount to $56 million rather than $68 million. However, the FTC contends that the damages run from the date of the original Complaint because its amendment adding the TSR claims relates back to the date of the original Complaint.

"An amendment to a pleading relates back to the date of the original pleading when: . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."   Fed. R. Civ. P. 15(c)(1)(B).   While

the FTC's original Complaint focused heavily on Zurixx's in-person seminars and workshops, it mentioned that Zurixx's telemarketers offered one-on-one telephone coaching and on-site mentoring programs as additional products that were sold using the same type of fraudulent misrepresentations used at the in-person seminars.   Compl. ¶¶ 83-86.   The Complaint alleges that Zurixx's telemarketers were part of its overall scheme to continually upsell consumers on the next service through misrepresentations and unsubstantiated claims as to earning potential rather than sharing any actual real estate investment advice.   *Id.*   The FTC's TSR claims, therefore, arise out of the same course of conduct set out in the original Complaint and relate back to the date of the original Complaint.   Therefore, the potential damages under the TSR claims run from the date of the original Complaint.

However, the real crux of the Zurixx Defendant's argument that Section 19 damages do not justify an asset freeze and receivership pending a trial on the claims relates to the nature of the damages available under Section 19 as opposed to the type of damages previously available under Section 13(b).   Prior to *AMG*, under Section 13(b), the FTC could seek disgorgement of allegedly ill-gotten gains measured by gross revenues.   Because the FTC simply had to show the amount of revenues Defendants gained from their allegedly deceptive practices, it could easily seek a preliminary injunction with an asset freeze and receivership.   In this case, the FTC could, and did, point to over $500 million in revenues as potential damages.   But Section 19 offers the FTC a significantly different type of damages.   To obtain the consumer redress allowed under Section 19, the Zurixx Defendants contend that the FTC must show the extent to which each consumer was harmed from the TSR violations, not merely gross revenues.   The FTC's reliance on Zurixx's gross telemarketing sales in the three years leading up to the Complaint does not demonstrate the individual consumer redress damages that are at issue under Section 19.   Because Plaintiffs must

12

now rely on specific violations, the justification for imposing an asset freeze and receivership has also changed significantly.

The FTC provided some evidence of individual consumer harm in its opposition to this motion, but the evidence consists of some individuals whose claims were outside the statute of limitations and some individuals who already received part of their money back in refunds. Zurixx also countered the FTC evidence with an exhibit containing a sampling of satisfied customers who would not seek consumer redress.   The Zurixx Defendants further assert that there are factual questions as to the damages available to each consumer based on disclaimers Zurixx allegedly read prior to each telesale.   Before any telesales purchase was completed, Defendants claim that a Zurixx compliance representative read consumers an Enrollment Confirmation and Authorization Agreement, acknowledging that no one had promised them any type of financial success, that no one guaranteed them any results, and that their level of success would depend on a variety of factors.   Although the FTC states that damages from TSR violations will continue to dwarf the defendants' ability to pay, gross revenues do not paint an accurate picture of potential damages and the FTC's specifically cited transactions do not demonstrate that damages will necessarily outweigh Defendants' ability to pay.

The Zurixx Defendants' arguments highlight the individualized nature of the consumer redress available under Section 19 that was not at issue when the FTC brought its Complaint, and the court entered the Preliminary Injunction pursuant to Section 13(b).   While the FTC has evidence of TSR violations, such as recordings of telesales calls from Zurixx telemarketers that are replete with false and unsubstantiated earnings claims, the FTC can no longer assume that every sale resulted in consumer injury.   The change in this case from the previous gross revenue damages under Section 13(b) to the individualized consumer redress damages under Section 19 is

a significant change in not only the amount of damages but the type of evidence needed to demonstrate those damages.   If the court is unsure at this juncture whether damages could amount to most, half, or only a small fraction of the gross telesales at issue, then the court cannot make a finding that likely Section 19 damages alone justify a complete asset freeze and a traditional Section 13(b) receivership.

The Division contends that its state law claims, which have been part of this litigation from the beginning, are sufficient to support the Preliminary Injunction, asset freeze, and receivership. The Division sued Zurixx under the Utah Consumer Sales Practices Act ("CSPA"), Utah Code Ann. § 13-11-1, the Business Opportunity Disclosure Act ("BODA"), *id.* § 13-15-1, and the Telephone Fraud Prevention Act ("TFPA"), *id.* § 13-26-1.   The stipulated Preliminary Injunction expressly states that it is based in part on the Division's state claims.

The Division's CSPA and BODA claims have been part of the litigation since its inception and the TFPA claims, similar to the FTC's TSR claims, relate back to the filing of the original Complaint because they arise under the same course of conduct set out in the original Complaint. *See, e.g., Sylvia v. Trevino*, 8422 F. App'x 175, 178-79 (10th Cir. 2020).   And, regardless of whether the TFPA claim relates back, it is part of the case now and, therefore, can potentially support the continuation of the asset freeze and receivership.

The CSPA specifically grants the Division the authority to seek equitable relief in the form of an injunction.   "The enforcing authority may bring an action in a court of competent jurisdiction to . . . enjoin, in accordance with the principles of equity, a supplier who has violated, is violating, or is otherwise likely to violate this chapter."   Utah Code Ann. § 13-11-17(1)(b). The Division sought permanent injunctive relief in the Complaint and preliminary injunctive relief in its Motion for TRO and Preliminary Injunction.   The CSPA gives the Division the authority to

14

recover damages on behalf of those consumers who timely file a complaint with the Division. The Division states that some consumers have already filed complaints and it expects others to do so. The Division also seeks statutory fines and penalties under the CSPA, TFPA, and BODA.

Under Rule 64 of the Federal Rules of Civil Procedure, state law remedies are available in this court for the Division's state law claims. "At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Fed. R. Civ. P. 64. Therefore, Rule 64 allows the court to follow Utah rules allowing receiverships and asset freeze injunctions. Utah Rule of Civil Procedure 66, which provides for the receivership remedy, provides: "A court may appoint a receiver . . . in any action in which property is in danger of being lost, removed, damaged or is insufficient to satisfy a judgment, order, or claim." Utah R. Civ. P. 66(a). The receiver, acting under the direction of the court, has the power "to seize property." Utah R. Civ. P. 66(e). And a court order to freeze assets is an element of a receiver's authority to seize property. *Interlaske Co. v. Von Hake*, 697 P.2d 238, 239 (Utah 1985).

While FRCP 64 allows this court to rely on URCP 66, these rules provide only a procedural basis for an injunction, receivership, and asset freeze. The rules do not mandate such procedures. Substantively, a party must provide the court with evidence supporting the use of such procedures. The Division's representation that some complaints have been filed and more will be filed does not identify specifically how many complaints it has received and what the damages are in relation to those complaints. While the Division is probably correct in stating that more complaints will be filed, it also does not provide any estimate of how many additional complaints will be received or the facts supporting its basis for making that claim. Because Zurixx has provided evidence that some customers were satisfied with their experience, the court cannot assume that every consumer

was injured.   And as with the Section 19 claims, it is unclear how many of these consumers who have filed complaints have already received some amount of refund.   Therefore, the court is left to speculate as to the number of complaints and the amount of potential damages at issue under the state law claims.

The Division also argues that the potential fines under the Division's state claims are sufficiently large to justify the asset freeze and receivership.   Zurixx sold its products to more than 70,000 people.   It is not clear that any law supports a preliminary injunction, receivership, and asset freeze to preserve a defendant's ability to pay fines and penalties, as opposed to consumer restitution.   But even if there was legal support for this position, the argument depends on several assumptions, for which the Division has offered only vague assertions—such as: (1) that each sale constitutes a violation of CSPA or TFPA; (2) that every violation is within the statute of limitations; and (3) that the court would assess the full fine for each violation.   Based on the factual and legal issues the Zurixx Defendants have raised, it is not clear at this point in the litigation whether the court would impose a fine on each transaction.

Given the number of sales Zurixx made over the years, the court agrees with Plaintiffs that there is a likelihood that Zurixx still faces substantial potential damages.   But Plaintiffs have not cited to any cases imposing an asset freeze or receivership based on Section 19 or the state law claims.   The claims of individual consumer redress could potentially be less than what the Receiver currently holds and the Defendants' available assets.   Yet the existing Preliminary Injunction is a rather draconian one.   It completely shut down Zurixx business, froze all its assets and records, put a Receiver in charge of all its affairs, and asked the Receiver to claw back as much money as possible for potential damages to consumers.   Given the change from a Section 13(b) case to a Section 19 case, the court cannot find the Plaintiffs have shown that every aspect of the

16

existing Preliminary Injunction--the asset freeze, the receivership, the clawback cases—are necessary to preserve the relief they seek under Section 19 and the state law claims.   As discussed above, the FTC cannot equate the total amount of telesales in the statutory period with consumer injury, and the Division's assertions regarding the state law claims are also speculative.   Because it is unclear whether the consumer redress will be more than the funds in the receivership as well as Defendants' assets, the court concludes that potential damages provide a basis for revisiting provisions in the Preliminary Injunction.

In considering whether the balancing of equities supports the present Preliminary Injunction, the court must also consider the Zurixx Defendants' argument that the continuation of the receivership and asset freeze is inequitable. In a typical case, a party usually must obtain a judgment and then pursue the Defendants' assets to satisfy the judgment.   Until then, defendants are entitled to have access to their assets and records to pay counsel, to mount their defense, and meet their own living expenses.   In this case, the Zurixx Defendants agreed to an asset freeze and limited stipend based on the law as it was currently being applied.   Given the change in the law and a potentially greater need for a particularized legal defense on the TSR claims, the court will lift the asset freeze in a limited fashion to grant each of the Zurixx Defendants an additional $50,000 to assist in their defense of the case.   Defendants did not submit evidence that they are struggling to meet their own living expenses.   The court assumes that after almost two years of having Zurixx shut down, Defendants have moved on and are capable of working to meet their own living expenses.   The court notes, however, that the asset freeze is necessary because the receivership funds are so low in comparison to Zurixx's gross revenues.   The Zurixx Defendants attempts to shield their gains through a complex web of LLCs and trusts also concerns the court in relation to lifting the asset freeze.   Because the Zurixx Defendants have demonstrated a

propensity to hide and dissipate assets, the court believes that a continuation of the asset freeze in most respects is necessary.

The court recognizes that the receivership created under the existing Preliminary Injunction was necessary because Defendant's business had to be shut down.   There is no argument that the business can be run and be in compliance with governing state and federal laws. Therefore, the court continues to believe it is necessary for the Receiver to be in control of the company.   The Receiver should maintain control of the business and its records, ensure that creditors are paid, and prevent assets from being dissipated.

But the court also recognizes that the receivership is costly, and a large part of that cost is the clawback cases the Receiver has had to bring to return money to the receivership estate.   The court believes that this aspect of the receivership should be revisited.   The Receiver has incurred over $1.2 million in legal fees in approximately 18 months.   The court believes that the Receiver has done good work and it has been beneficial.   However, with a change in the law and an uncertainty as to the ultimate damages at issue, the court must weigh the cost of these clawback cases and the equities involved.   The Receiver's ancillary clawback cases have proven difficult and costly.   In a typical civil case, ancillary clawback cases would not occur until the parties knew the amount of the judgment against a defendant and the defendant could not satisfy the judgment. In this case, the Receiver was tasked with trying to get as much money back into the estate as possible because over $500 million was potentially at stake.   While Plaintiffs still believe that every penny the Receiver can recover will still be insufficient to pay the judgment, the court is not as sure.   Despite Plaintiffs' claims to the contrary, the court believes that those circumstances have changed.

The court is also concerned with the equities involved in having the Receiver pursue these clawback cases despite the uncertainty of damages at issue under Section 19 and the state claims. While the enforcement action is against Zurixx's owners and their related entities, the clawback cases are against employees, contractors, and charities who received funds from Zurixx's owners. The clawback cases are far less complicated and reach judgment far more quickly than the underlying enforcement action.   Therefore, these other entities will be required to pay their judgments before it is known whether the Defendants in the underlying enforcement action can satisfy the judgment in their case.   For example, if the damages in the underlying enforcement action ultimately prove to be only $25 million and the receivership funds and Defendants in the enforcement action can cover those damages, it does not seem equitable to have previously taken three years of an employee's salary to pay for the judgment that the owner can pay for himself. The court realizes that these clawback cases are more nuanced, and involve individuals who were making fraudulent misrepresentations.   But the equities of having such individuals and entities pay on a judgment before the owners of the actual business, who profited much more from the scheme, concern the court when it is uncertain whether it is actually necessary to get every potential dollar back in the receivership estate.

This case is complicated by the fact that the Zurixx Defendants have tried so aggressively to hide their gains that there appears to be a need to recover whatever funds can be found.   The court continues to have some belief that Plaintiffs in the enforcement action will uncover more assets available in the Zurixx Defendants web of LLCs and trusts.   The court believes that all efforts should presently be put into this effort.   If the ultimate damages are $50 million or $150 million, the court believes that when it enters that specific judgment, Plaintiffs and the Receiver should make every effort to have the principal defendants satisfy that judgment first.   The specific

19

amount of the judgment will be able to guide the parties and court as to whether the clawback cases are necessary at that time.   The court's equitable concerns are heightened in this case because of the court's present uncertainty as to the scope of damages.   The court must weigh that uncertainty against Plaintiffs.   Because the court does not have clear evidence at this point of the litigation that Defendants cannot satisfy a potential judgment, the court concludes that the ancillary clawback cases are not presently necessary.   Accordingly, the court stays and administratively closes all the Receiver's ancillary clawback cases presently pending in this court.   If Defendants in this action cannot satisfy the judgment ultimately entered against them, Plaintiffs can renew the ancillary cases at that time.   All pending motions in the ancillary cases are denied without prejudice.   If the cases are reopened, the parties will need to readdress the issues pending in those cases with the facts and law relevant to the motions at that time.

The Receiver was also tasked with seizing and maintaining Defendants' documents and electronic data.   At the time of the original Preliminary Injunction, the parties and court were concerned that Defendants might destroy documents.   Plaintiffs, with the assistance of the Receiver, obtained all of Defendants' data.   At this point in the case, however, the evidence preservation provisions of the Preliminary Injunction have served their purpose.   Plaintiffs should allow the Zurixx Defendants access to evidence necessary to mount a defense.   The parties should decide how this can be done in the most economical way possible.

The court does not believe there is a basis for requiring Plaintiffs to pay the fees incurred by the Receiver and his law firm from the date of the *AMG* ruling going forward.   The court believes that the Plaintiffs have proceeded in good faith and Plaintiffs may be correct that the ultimate judgment is larger than Defendants can pay.   The Zurixx Defendants should not lose sight of the fact that they are the parties who engaged in conduct necessitating this case to be

brought in the first place.   The ruling in *AMG* that the FTC should obtain equitable monetary relief against them in an agency proceeding, not court, in the first instance, does not change the egregious conduct alleged against Defendants and the widespread harm Defendants have allegedly caused.   The court finds it unquestionably equitable for the Defendants in this action to continue paying for the Receiver's ongoing, but now much more limited, services.

The court continues to believe that most of the receivership, asset freeze, and asset preservation provisions in the Preliminary Injunction are necessary to preserve the court's ability to grant relief for violations of the TSR and the Utah statutes.   Defendants have shown some willingness to dissipate assets and have aggressively attempted to shield their gains despite obtaining those gains through fraudulent means.   These factors weigh against a complete dissolution of the prejudgment protections that are in place.   However, the court believes the above limits and modifications to the Preliminary Injunction are necessary given the change in the nature of the available damages, the uncertainty as to the amount of damages, the potential for the Defendants in this action satisfy the ultimate judgment in this case, and a balance of the equities. The parties should meet and confer and submit a new Amended Preliminary Injunction consistent with the court's modifications in this decision within twenty days of the date of this Order.   The existing Preliminary Injunction will remain in place until the court enters the amended Preliminary Injunction.

As outlined above, the court grants in part and denies in part the Zurixx Defendants' Motion to Modify Preliminary Injunction.

### Zurixx Defendants' Motion for Partial Summary Judgment As To Relief Under Section 13(b) and BODA and

**Spangler Trust Defendants' Motion for Partial Summary Judgment[1]**

The Zurixx Defendants move for an order of partial summary judgment holding that the FTC is not entitled to equitable monetary relief under Section 13(b) of the FTC Act and that the Division is not entitled to any monetary relief under the Utah Business Opportunity Disclosure Act ("BODA").   The FTC filed a Non-Opposition to Defendants' motion, and the Division opposed the motion with respect to BODA.

### 1.   Section 13(b) of the FTC Act

The FTC agrees that it is not entitled to equitable monetary relief under Counts I-IV.   The FTC, however, reserved the right to seek equitable monetary relief if the law changes again during the pendency of the lawsuit due to a statutory amendment to the FTC Act.   The court recognizes those rights and grants partial summary judgment that Section 13(b) of the FTC Act does not entitle the FTC to equitable monetary relief under Counts I-IV.

### 2.   BODA

Defendants argue that the Division is improperly seeking fines and civil penalties against Defendants in this action for alleged violations of BODA when the statute specifically states that those fines and penalties must be imposed by the Division Director.   The Division, however, argues that BODA gives it the option of proceeding in the agency or in court and that it can get fines and civil penalties in either forum.

Courts in the Tenth Circuit look to relevant state court decisions to determine the scope of a state agency's statutory authority.   *Woodward v. Jefferson City*, 18 F. App'x 706, 712-13 (10th Cir. 2001).   In Utah, when the Utah Legislature vests authority in a state agency, "the powers are

---

1   The Spangler Trust Defendants incorporate all the arguments raised by the Zurixx Defendants in their motion.

limited to such as are specifically mentioned." *Heber Light & Power Co. v. Utah Pub. Serv. Comm'n*, 231 P.3d 1203, 1208 (Utah 2010).

BODA requires companies offering assisted marketing plans to register with the Division and provide disclosures to consumers.   Utah Code Ann. § 13-15-4.   The Division alleges that the Zurixx Defendants violated BODA by failing to file the required information with the Division and failing to provide the required disclosure statements to prospective purchasers.   "If a seller fails to file the disclosures . . . , the division . . . shall begin adjudicative proceedings and shall issue a cease-and-desist order."   *Id.* § 13-15-6(1).   Section 13-5-6 provides that "in addition to other penalties under this chapter," "the division director may impose an administrative fine of up to $2500 for each violation of this chapter."   Utah Code Ann. § 13-15-6(4). The statute's express identification of the "division director" as the individual authorized to impose administrative fines indicates that the Utah Legislature chose to authorize only the division director to impose those fines in an administrative agency proceeding.

In addition to fines, the Division's ability to recover civil penalties under BODA appears to be limited to cases where someone "violates any cease-and-desist order issued under [BODA]." Utah Code Ann. § 13-15-7.   Under Section 13-15-7, civil penalties of up to $5000 per violation can be imposed in any civil action brought against any person who violates a cease-and-desist order.   The Division admits that it never issued a cease-and-desist order to any of the Defendants for BODA violations.   Therefore, the plain language of Section 13-15-7 does not provide Defendants with a basis for obtaining civil penalties under BODA in this action.

The Division, however, argues that subsection (3) of Section 13-15-6 specifically refers to an action in a court of competent jurisdiction, and its reference to providing the Division with "any other relief" entitles it to get fines and penalties in this action.   Subsection (3) states that "[i]n the

event the division is granted judgment or injunctive relief in an appropriate court of competent

jurisdiction, the division, in addition to any other relief, is entitled to an award of reasonable

attorney's fees, costs of court, and investigative fees." *Id.* § 13-15-6(3).   The Division contends

that this provision's general use of "any other relief" entitles it to the specific fines and penalties

provided for in the statute's other provisions.

But the Division's argument about the scope of "any other relief" under BODA does not

make sense in the context in which the language arises.   The statute specifically allows the

Division to obtain "administrative fines" from the Division Director in the next subsection.   *Id.* §

13-15-6(4)(a).   The statute also specifically allows the Division to obtain "civil penalties" in the

next section when the person violates a cease-and-desist order.   *Id.* § 13-15-7.   When these other

provisions specifically provide for the relief, it does not make sense that the Legislature would

intend for the Division to be able to obtain those same remedies in a court action through use of

such a vague and general provision.   The Legislature could have easily referenced those other

provisions, but it did not.   When the Legislature "includes particular language in one section of a

statute but omits it in another section of the same Act, it is generally presumed that [the legislature]

acts intentionally and purposely in the disparate inclusion or exclusion."   *Russello v. United

States*, 464 U.S. 16, 23 (1983).

Furthermore, if Section 13-15-6(3)'s language allowed a court to award civil penalties, it

would render Section 13-15-7 meaningless.   The court will not read meaning into the general

language of Section 13-15-6(3) that would conflict with the clear language of Section 13-15-7.

Moreover, the court will not read language into subsection 3, that the Legislature could have easily

added into subsection (4).   If the Legislature intended for a court to award "administrative fines,"

it could have easily stated that "the division director *and a court of competent jurisdiction* may

24

impose an administrative fine."   It did not. The court assumes the Legislature knows how to identify how and when a party is entitled to certain monetary relief.

The Division's reliance on the statute's vague reference to "any other relief" as its basis for obtaining civil fines and penalties is like Judge Breyer's finding in *AMG* that such a "reading would allow a small statutory tail to wag a very large dog."   *AMG Capital Management LLC v. FTC*, 141 S. Ct. 1341, 1348 (2021).   BODA provides for several types of monetary relief in its sections and subsections, including specific instances in which fines and civil penalties are available.   To interpret the language "any other relief" to encompass fines and civil penalties specifically provided for in other sections runs counter to basic notions of statutory construction. That the Legislature specifically spelled out these forms of monetary relief in neighboring subsections and a subsequent section demonstrates that it did not impliedly authorize such relief in its passing reference to "other relief" in Subsection (3).

The Division's argument that a remedy should be made available by necessity based on the "cause of action" created under BODA is also unpersuasive.   That doctrine applies only in the context of private rights of action.   *See Franklin v. Gwinnett Cnty Pub. Schs.*, 503 U.S. 60, 65 (1992).   The Division is not a private actor.   The Division's authority is limited by BODA's plain language.   And, contrary to the Division's assertion, Defendants' reading of BODA does not render it without a remedy.   The Legislature provided means for the Division to recover civil penalties and fines.   The Division, however, chose not to pursue those administrative remedies in this case, but rather to proceed in court.

The court concludes that the Division is not entitled to seek administrative fines or civil penalties for BODA violations in this action.   Accordingly, the court grants Defendants' Motion for Partial Summary Judgment as to Relief Under Section 13(b) and BODA.

**Relief Defendant Stephenie J. Spangler's Motion for Summary Judgment**

Relief Defendant Stephenie J. Spangler moves the court for an order of summary judgment: (1) holding that Plaintiffs are not entitled to an order requiring her to disgorge allegedly ill-gotten funds; and (2) dismissing her as a relief defendant.   Relief Defendant Stephenie Spangler is Defendant Jeffrey Spangler's wife.   Jeffrey Spangler was Zurixx's president, and he managed the coaching and telesales departments.   Jeffrey Spangler admits that he controlled various corporate Defendants and trusts: he was an officer of Dorado Marketing and Management, a manager of CJ Seminar Holdings, a manager of JSS Investment Ventures LLC, and grantor of JSST Trust.   Stephenie Spangler is the sole beneficiary of JSS Trust.   Jeffrey Spangler contends that he did not own any of these corporate Defendants and did not share in any other money distributed to them.   But Zurixx and Dorado distributed tens of millions of dollars of profits to JSS Investment Ventures and Jeffrey Spangler wrote checks to Stephenie Spangler from JSS Investment Ventures' bank accounts.   Stephenie Spangler admits that she received funds from JSS Investment Ventures and that she did not provide any goods or services to JSS Investment Ventures or any other corporate Defendant for those funds.   Based on these facts, the FTC named Stephenie Spangler as a relief defendant and seeks disgorgement of the money she obtained.

Spangler contends that Plaintiffs cannot seek an order of disgorgement against her under Section 13(b) or Section 19 of the FTC Act.   After the *AMG*'s ruling that the FTC cannot obtain equitable monetary relief under Section 13(b), Spangler argues that the FTC is not allowed to get equitable monetary relief such as disgorgement against her.   Historically, courts and the FTC have relied on Section 13(b) for disgorgement, not Section 19.   In *AMG*, the Supreme Court changed that practice.   Spangler argues that the text of Section 19, does not allow for the same type of broad equitable relief the FTC previously obtained under Section 13(b).

26

Subsection 19(b) of the FTC Act provides that: "The court in an action under subsection (a) shall have jurisdiction to grant such relief as the court finds necessary to redress injury to consumers or other persons, partnerships, and corporations, resulting from the rule violation or the unfair or deceptive act or practice, as the case may be.   Such relief may include, but shall not be limited to, rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting the rule violation or the unfair or deceptive act or practice, as the case may be; except that nothing in this subsection is intended to authorize the imposition of any exemplary or punitive damages."

Under this section, a court can "grant such relief as the court finds necessary to redress injury to consumers," but it does not allow for "the imposition of any exemplary or punitive damages."   Spangler argues that the purpose of disgorgement is to deter wrongful conduct, not redress consumer injury.   In contrast to restitution, which aims to compensate victims, disgorgement aims to wrest "ill-gotten gains from the hands of a wrongdoer."   *Osborn v. Griggin*, 865 F.3f 417, 461 (6th Cir. 2017).   "It is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs."   *Id.*   "Disgorgement does not seek to compensate the victims of the wrongful acts, as restitution does."   *Id.*   "The purpose of disgorgement is not to redress consumer injuries but to deprive wrongdoers of ill-gotten gains."   *FTC v. AMG Servs., INC.*, 2017 WL 1704411, at *11 (D. Nev. May 1, 2017).   "Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable."   *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010).

The FTC alleges that Jeffrey Spangler and the other Zurixx Defendants violated the TSR under Section 19 of the FTC Act and brought in over $68 million in telesales during the three years

prior to the Complaint.   It is undisputed that Stephenie Spangler received some of these allegedly ill-gotten funds from the Zurixx Defendants and that she has no legitimate claim to those funds. Spangler claims that Plaintiffs must show that their claims against her arises under a federal statute.   But a federal court's authority to order that a relief defendant turn over ill-gotten funds comes from the court's inherent equitable powers, not a statute.   For decades, federal court have allowed government agencies, including the FTC, the SEC, and the CFTC, to sue relief defendants who are "not accused of wrongdoing" if they have "received ill-gotten funds" and "do not have a legitimate claim to those funds."   *SEC v. Cavanagh*, 155 F.3d 129, 136 (9th Cir. 1998).

In *SEC v. Colello*, the Ninth Circuit explained that "ample authority supports the proposition that the broad equitable powers of the federal courts can be employed to recover ill-gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong."   139 F.3d 674, 676 (9th Cir. 1998).   The court continued that "federal courts have inherent equitable authority to issue a variety of ancillary relief measures in actions brought by the SEC to enforce the federal securities laws. . . . This broad power extends over third parties to the action."   *Id.*   Thus, the court concluded that "the SEC may name a non-party depository as a nominal defendant to effect full relief in marshalling of assets that are the fruit of the underlying fraud."   *Id.* at 677.

Other courts have similarly invoked inherent equitable authority and pointed to the common law as bases for claims against relief defendants in cases brought by the FTC against relief defendants.   Even if the court needed a statutory grant of equitable jurisdiction in order to award equitable relief against Spangler, Section 19 would provide it in this case.   Section 19 authorizes equitable remedies in granting such relief as the court finds necessary to redress consumer injury.   The plain language of Section 19 specifies that such relief includes, but is not

limited to, recission or reformation of contracts, the return of property, or the refund of monies paid by the victims of Defendants' TSR violations.   The court may order Spangler to return the money she received from Defendants so that it can be refunded to victims.

Nothing in Subsection 19(b)'s language limits the court's equitable jurisdiction to allow a party to be added as a relief defendant.   Spangler's argument that she is not an appropriate relief defendant because disgorgement serves to deter wrongful conduct rather than to redress consumer injury has no merit.   By definition, relief defendants are not accused of wrongdoing, yet courts have long required relief defendants to return ill-gotten gains.   Although Spangler is no longer subject to a full disgorgement of monies under Section 13(b), the return of money for consumer redress is specifically provided for in Section 19.   Regardless of whether the court's equitable powers are inherent or statutory, and it is likely both, equity requires that Spangler return the money she received from the deceptive scheme. There is no basis for preemptively shielding her allegedly ill-gotten gains from potential consumers deceived from Defendants' telesales.   The court believes it is appropriate to leave Spangler in as a relief defendant in case her money is necessary for consumer redress under Section 19(b).   Accordingly, the court denies Spangler' motion for summary judgment.

## CONCLUSION

Based on the above reasoning: (1) the Zurixx Defendants' Motion to Modify Preliminary Injunction Order [ECF No. 244] is GRANTED IN PART AND DENIED IN PART as outlined above; (2) the Zurixx Defendants' Motion for Partial Summary Judgment as To Relief Under Section 13(b) and BODA [ECF No. 245] and the Spangler Defendants' Motion for Partial Summary Judgment [ECF No. 257] is GRANTED; (3) Relief Defendant Stephenie Spangler's Motion for Summary Judgment [ECF No. 259] is DENIED.   The parties shall meet and confer

and submit an Amended Preliminary Injunction consistent with this decision within twenty days of the date of this Order.

As explained above, the following ancillary receivership actions are STAYED and ADMINISTRATIVELY CLOSED and all pending motions in those cases are denied without prejudice:   2:20-CV-544, 2:20-CV-545, 2:20-CV-546, 2:20-CV-548, 2:20-CV-549, 2:20-CV-550, 2:20-CV-551, 2:20-CV-552, 2:20-CV-761, 2:20-CV-762, 2:20-CV-763, 2:20-CV-765, and 2:21-CV-331.

DATED this 8th day of November, 2021.

BY THE COURT:

DALE A. KIMBALL,
UNITED STATES DISTRICT JUDGE