**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION and UTAH DIVISION OF CONSUMER PROTECTION,** | **MEMORANDUM DECISION AND ORDER** |
| **Plaintiffs,** | Case No. 2:19-cv-713-DAK-DAO |
| vs. | Judge Dale A. Kimball |
| **ZURIXX, LLC, et al.,** | Magistrate Judge Daphne A. Oberg |
| **Defendants.** | |

This matter is before the court on Receiver David Broadbent's Motion to Lift Stay in Ancillary Cases and To Allow the Receiver to File Additional Ancillary Cases.   On February 22, 2023, the court held a hearing on the motion by Zoom videoconferencing.   At the hearing, the Receiver was represented by Doyle Byer and Michelle Quist, the Federal Trade Commission ("FTC") was represented by Joshua A. Doan, the Utah Division of Consumer Protection was represented by Douglas Crapo, Movants Matt Davis, Robert Shemin, David Freier, Mark Hrisko, and Claude Swails were represented by Jason McNeill and Eric Schnibbe, and Objectors Michael Grow and Daniel Altamirano were represented by Andrew Collins.   The Movants and Objectors are defendants in the Receiver's ancillary claw back cases.   Rather than file a motion to reopen in each ancillary case, the Receiver filed the motion only in this underlying enforcement action.   It is unclear whether all of the defendants in the ancillary claw back cases have notice of the motion. After hearing arguments from counsel, the court took the motion under advisement.   The court has carefully considered the parties' memoranda, the law and facts relevant to the motion, and issues the following Memorandum Decision and Order on the pending motion.

**BACKGROUND**

In response to motions filed in this FTC enforcement action after the United States Supreme Court's decision in *AMG Capital Management, LLC v. FTC*, 141 S. Ct. 1341 (2021), this court issued a November 8, 2021 Memorandum Decision and Order ("2021 MDO"), modifying the preliminary injunction, staying the Receiver's ancillary actions, and precluding the Receiver from filing any further ancillary actions challenging allegedly fraudulent or voidable transfers until further ruling by the court.

In *AMG Capital,* the Supreme Court held that Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), does not grant the FTC authority to obtain equitable monetary relief.   While the FTC was initially proceeding primarily under Section 13(b) for gross revenue damages, it also had claims under the Telemarketing Sales Rule ("TSR"), 15 U.S.C.A.§§ 6102, 6105(b).   For TSR violations, the FTC can pursue damages under Section 19 of the FTC Act, which allows redress for injury to consumers.   The court's 2021 MDO did not resolve the contested issue of how consumer redress under Section 19 of the FTC Act would be measured in this case.   But the 2021 MDO recognized that the FTC's potential Section 19 damages would be significantly less expansive than the pre-*AMG* Section 13 damages and that difference impacted the preliminary injunction and receivership.   The court indicated that the parties could more fully address the specifics of the redress issues under Section 19 on summary judgment, but the parties settled the case shortly after the court's ruling.

The court's prior ruling recognized that Zurixx could still face substantial potential damages under Section 19, but Plaintiffs did not cite to any cases imposing an asset freeze or receivership based on Section 19 or the state law claims.   That remains the case with respect to the Receiver's motion to reopen the ancillary cases.   This court concluded that given the change from

2

a Section 13(b) case to a Section 19 case, Plaintiffs had not shown that every aspect of the existing Preliminary Injunction—the asset freeze, the receivership, the claw back cases—are necessary to preserve the relief they seek under Section 19 and the state law claims.   The court recognized that the receivership created under the existing Preliminary Injunction was necessary because Defendant's business had to be shut down and there was no argument that the business could be run in compliance with governing state and federal laws.   Therefore, the court left the Receiver in control of Zurixx to maintain control of the business and its records, ensure that creditors are paid, and prevent assets from being dissipated.

But the court also recognized that the receivership was costly, and a large part of that cost was the ancillary claw back cases the Receiver brought to return money to the receivership estate. The court believed that this aspect of the receivership should be revisited with the change in the law and an uncertainty as to the ultimate damages at issue.   The court weighed the cost of the claw back cases and the equities involved.   The court was concerned with the equities involved in having the Receiver pursue claw back cases despite the uncertainty of damages at issue under Section 19 and the state claims.   The ancillary claw back cases are against employees, contractors, and charities who received funds from Zurixx's owners, and it was unclear whether the Defendants in the underlying enforcement action would be able to satisfy the judgment in their case.   The court must weigh the uncertainty against Plaintiffs and determined that the ancillary claw back cases were not presently necessary.   Accordingly, the court stayed and administratively closed all the Receiver's ancillary claw back cases.   The court stated that if Defendants in this action cannot satisfy the judgment ultimately entered against them, Plaintiffs could renew the ancillary cases at that time.

On December 2, 2021, in response to the Court's 2021 MDO, the parties entered an

Amended Stipulated Preliminary Injunction.   On December 16, 2021, the parties entered a

stipulation to stay the case for 60 days to pursue settlement.   The parties settled the case within

that time frame.   On February 14, 2022, the parties filed a motion to enter a Stipulated Permanent

Injunction and Monetary Judgment memorializing their settlement, which the court granted the

next day.

Under the parties' settlement, the three individual owners of Zurixx each paid

$2,333,333.33 in monetary damages, for a total of $7 million, and the defunct Zurixx entities

agreed to pay $104,700,000.00.   Because the Receiver is still in control of the Zurixx entity, he

apparently represented the entities in the settlement negotiations.   The individual owners paid

their $7 million in damages soon after the parties entered into the settlement.   There is no

evidence that the entities have paid anything on the monetary judgment against them or could pay

an amount anywhere near the settlement amount.   The Preliminary Injunction in this matter shut

down their ability to operate and make any additional income. However, the amount of money the

entities have on hand has apparently not been paid toward the settlement obligation, possibly

because the money on hand is necessary to pay for the Receiver's costs.

The ancillary cases seek to return all money the Zurixx entities paid to certain defendants

based on the premise that Zurixx was insolvent while it was operating and Zurixx did not receive

value in return.   The defendants in the ancillary cases involve Zurixx telesales employees,

contract speakers at Zurixx workshops, celebrity endorsers paid royalties on sales, and a charitable

organization.   The transfers at issue range from a one-time charitable donation of $150,000 to

$5.5 million for a contractors work over six years.

The Receiver now asks the court to lift the stay it previously imposed on the ancillary cases

to allow those pending cases to move forward and to allow the receiver to file additional cases.

The court received oppositions from defendants in eight of the cases and no responses from defendants in four of the cases.   Because the Receiver filed his Motion to Reopen the ancillary cases in only this underlying FTC enforcement action, instead of the cases he seeks to reopen, it is unclear whether all the defendants in the ancillary cases have notice of the pending motion.

## DISCUSSION

### Receiver's Motion to Reopen Ancillary Cases

The Receiver asks the court to reopen the ancillary cases this court stayed and administratively closed in the court's 2021 MDO and to permit the Receiver to file additional ancillary cases.   The Receiver argues that the court's concerns about the ancillary cases proceeding more quickly than the underlying enforcement action and the possibility that the defendants in the enforcement action might be able to pay the ultimate judgment have now been resolved because the parties in the enforcement action settled the case and agreed to a stipulated Permanent Injunction and Monetary Judgment.   Among other things, the Permanent Injunction and Monetary Judgment imposed a monetary judgment of $2.33 million against each individual defendant, and $104.7 million against the receivership entities.

The Receiver argues that the court should reopen the ancillary cases and permit him to file additional cases because the $104.7 million judgment against the receivership entities cannot be satisfied.   The Receiver currently has only $5.3 million in assets, and he claims that he will not be able to recover the amount the entities agreed to in the settlement.   The Receiver claims that if he was able to recover every penny from his current cases, he would recover approximately $33 million and that he could collect another $38 million from his unfiled cases.

The Receiver's motion to reopen the cases does not address the change in this case after *AMG*, even though that is what precipitated the court closing the ancillary cases.   The Receiver

5

merely states that it is time for those cases to move forward on their merits.   However, the change

in this case as a result of *AMG* and the parties' settlement of the underlying enforcement action in

light of those changes clearly impacts the determination to reopen the ancillary cases.

In the court's 2021 MDO, it noted that after *AMG* the FTC was limited to § 19 damages for

telesales violations and it could not equate the total amount of telesales in the statutory period with

consumer injury.   Plaintiffs in this enforcement action chose not to prove damages.   Rather, they

settled their dispute.   The Stipulated Order for Permanent Injunction and Monetary Judgment the

parties filed with the court contains no findings of any damages suffered by any individual

customers.   The monetary judgment in the parties' settlement is not based on damages.   The

$104.7 million judgment against the entities, therefore, is not based on evidence of specific

violations and individual consumer redress.

To obtain an actual damages award from the court, Plaintiffs were required to present

evidence, not allegations, of consumer injury.   Defendants submitted evidence in the prior

briefing from customers who were satisfied with their experience with Zurixx and evidence that

some unsatisfied customers had already received a refund.   The court has already ruled that

Plaintiffs could not rest on a claim that every customer was harmed.   Before the court allows the

Receiver to collect money from the ancillary defendants, the Receiver must present evidence of

actual consumer injury that money would be used to address.

The Receiver will also have to tie each ancillary defendant to the individualized consumer

injury.   The Receiver cannot point to an exorbitant settlement figure of $104.7 million and claim

that every ancillary defendant is liable for paying that agreed upon settlement figure.   The

Receiver has not demonstrated that the money he seeks in the ancillary cases will go to address

individual consumers.   The Receiver will need to present an accounting to the court of

documented consumer injury that the money will be going to address.   The Receiver cannot

merely collect money for damages the Plaintiffs decided not to prove.

It is also unclear to the court why Zurixx's individual owners would not be responsible to

pay the entities' agreed upon settlement, but their employees, contractors, and charities would be.

The Receiver seeks to obtain $71 million from employees, contractors, influencers, and charities

in the ancillary cases, which is ten times the $7 million Plaintiffs agreed to settle for with Zurixx's

owners.   The individual owners' $2.3 million settlements are apparently their only monetary

obligation in the settlement.   Plaintiffs' settlements with the individual owners are a small

fraction of the money the owners made during Zurixx operations.   However, the Receiver, in

comparison seeks all the money paid to Zurixx's employees, contractors, influencers, and charities

during the same period of operations to pay for the agreed upon settlement against the Zurixx

entities.

Although the court entered the parties' stipulated agreement, it did so only because the

parties stipulated to its entry.   The parties settled the case and asked the court to enter the agreed

upon documents.   The parties' agreement to settle the case with such relatively small monetary

judgments against the individual owners and such a high monetary judgment against now defunct

entities represented by the Receiver does not appear to be based on any evidence.   The settlement

documents do not explain the differences.   Under the stipulated Preliminary and Permanent

Injunction orders entered in this case, the Receiver is charged with representing the Zurixx entities

and being accountable directly to this court.   In asking the court to reopen the ancillary cases to

obtain money to pay the monetary judgment against the defunct entities, the Receiver does not

address or explain why the entities are considered so much more liable for the prior wrongdoing

than the individuals who started the business and profited most from the alleged wrongdoing.

While the court uses the phrase "more liable," the court must again acknowledge that the stipulated settlement amounts in this case are not based on any evidence of actual injury or harm and thus does not actually represent any parties' actual liability.   The amounts are merely agreed upon figures.   How and why the parties would assign a monetary judgment against the defunct entities for an amount they knew they could not pay is not before the court.

However, the settlement appears to assume that the entity was the "evil zombie" rather than the actual owners who controlled the entity.   The parties in these ancillary cases have previously raised the "evil zombie" doctrine, which is applied in Ponzi scheme cases to allow an entity to bring claims it otherwise could not bring because replacing the company's ownership with a receiver cleanses the entity from the wrongdoing of the evil zombies who previously ran the entity fraudulently.   However, the parties' settlement appears to suggest that the opposite is the case here.   The settlement in this case makes the evil zombies responsible for $2.3 million each and makes the defunct entity--now run by a court-appointed Receiver and cleansed from the evil zombies—responsible for $104 million.

The court appointed the Receiver in this case through the court's equitable powers.   Even after *AMG*, the court believes that the court could appoint a Receiver under Section 19 for the TSR violations to monitor the entities' assets and oversee an asset freeze.   But, as the court recognized in its 2021 MDO, the court continues to be concerned about the Plaintiffs and Receiver seeking to have employees and contractors pay on a judgment in a case where Plaintiffs did not sue these Defendants for violations of the FTC's Telemarketing Sales Rule ("TSR").   Rather, the Receiver has sued these parties alleging fraudulent transfers, based on presumptions applicable to Ponzi schemes.   Zurixx was not a Ponzi scheme and there is no basis for presuming that the FTC's allegations that Defendants violated the TSR made Zurixx insolvent from its inception.

Violations of rules allowing for some individual consumer to obtain redress do not equate to something akin to a Ponzi scheme.

To the extent that the Receiver's fraudulent transfer cases are based on the premise that the Ponzi scheme assumption applies, which it may have under pre-*AMG* Section 13(b) cases, that premise was lost after *AMG* when the case switched to a Section 19 case.   There is not the same basis for fraudulent transfer cases under Section 19 as there was under the old Section 13(b) system that *AMG* ended.   Section 19 damages have to be tied to individual consumer injury. Rather than address the changes to the case as a result of AMG, the Receiver argues that the court should reopen each ancillary case and deal with the merits of each at that time.   But the court appointed the Receiver in this enforcement action and what happens in this action controls the role of the court-appointed Receiver.   After *AMG*, there can be no underlying assumption that Zurixx was insolvent from its inception.

Without an underlying assumption of insolvency, the Receiver would need to prove that Zurixx was insolvent at the time of each transfer at issue in the ancillary cases.   The FTC settled the case instead of going to the expense of proving consumer injury/redress under the TSR violations.   Without knowing how much consumer redress Zurixx may have owed at any point in time, it would be extraordinarily expensive for the Receiver to prove insolvency.   The issue then is whether the court should allow the Receiver to reopen these costly ancillary cases to recoup money for unproven consumer injury claims.   The cost/benefit analysis of pursuing the ancillary cases at this point does not weigh in favor of pursuing them.   Each case could cost as much as the Receiver seeks in the given case.

This court's 2021 MDO specifically stated that the ancillary cases were stayed and administratively closed until it was clear that Defendants in the underlying enforcement action

9

could not pay the Section 19 damages.   At that time, the court assumed the parties would litigate

the Section 19 claims.   While the 2021 MDO did not specifically outline how Section 19 damages

would be calculated in this case, the court recognized that they are significantly less than the prior

Section 13(b) damages and are based on individualized consumer claims.   But, instead of

litigating the Section 19 claims and proving damages, the parties agreed to settle the entire action.

The settlement amount is not evidence of the Section 19 damages.   Many factors go into what a

party agrees to for settlement purposes.   The FTC and Receiver have yet to prove any actual

consumer redress damages.   In asking to reopen the ancillary cases, the Receiver has not notified

the court of, or attempted to establish, how many consumer claims it has.   If Plaintiffs do not have

specific consumer claims more than the $7 million Plaintiffs received from the individual owners

and the $5.3 million in receivership assets, there is no basis for pursuing the ancillary cases.

The Tenth Circuit does not appear to have ever addressed the issue of consumer redress

damages under Section 19 of the FTC Act.   However, the Ninth Circuit has several cases on the

issue.   *See, e.g., FTC v. Elegant Solutions*, 2022 WL 2072735 (9th Cir. June 9, 2022).   In *Elegant*

*Solutions*, the Ninth Circuit stated that individual defendants can be liable for monetary damages

under the FTC Act, but such relief "requires that the individual had knowledge of the corporation's

fraudulent conduct and consumer injury."   *Id.* 2.   The court recognized that Section 19 authorizes

the FTC to seek monetary relief to address TSR violations and that the district court properly

awarded relief under Section 19 "based on a calculation of consumer loss, as opposed to a

calculation of net unlawful profits."   *Id.* *3.   "Section 19 does not, however, authorize

'disgorgement' that 'exceeds redress to consumers."   *Id.*   Therefore, the Ninth Circuit required

the district court to modify its injunction to remove a sentence "providing that '[a]ny money not

used for such equitable relief is to be deposited to the U.S. Treasury as disgorgement.'"   *Id.*

10

In *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595 (9th Cir. 1993), the Ninth Circuit explained that consumer redress is not equal to the seller's receipts and profits and any award exceeding redress to consumers is punitive in nature and expressly prohibited. *Id.* at 607. The court noted that Congress's intent "was not to punish deceptive trade practices," but "only to authorize redress to consumers and others for 'injury resulting' from the trade practice." *Id.* at 608.

Under Ninth Circuit case law, a consumer must make a valid claim for Section 19 redress and the FTC cannot keep any money in addition to that redress. In this case, the Receiver has not stated what "valid claims" it needs to pay. Rather, it relies on an inflated settlement amount that does not specifically demonstrate consumer injury damages. The mere entry of a stipulated judgment does not prove individualized, actual damages. Moreover, a fraudulent transfer action is not tied to consumer redress.

If the Receiver has not demonstrated that it has valid consumer claims exceeding $12.3 million, there is no reason to reopen the ancillary cases. The settlement amount does not list valid consumer claims filed with Plaintiffs. Given the sea change with *AMG*, the ancillary fraudulent transfer cases should remain closed, just like the underlying enforcement action. If the FTC can make a claim against these defendants for a violation of Section 19, it can bring an action against them and prove their fraudulent conduct and the specific consumer injury tied to their conduct. But there is no basis for fraudulent transfer actions by the Receiver.

To the extent that the court appointed the Receiver with its equitable powers, the court notes that it is not equitable to take an employee's entire salary for five years while settling with the owners, who profited so substantially from the venture that the FTC cannot trace where it all went, for a small fraction of their profits. The court will not invoke its equitable powers to allow the Receiver to pursue several years of an employees entire salary to pay a monetary judgment that

11

is not based on consumer injury and proving such injury would not be cost effective.   After

settling with the owners for a small fraction of the company's revenues, and for an amount they

could immediately pay, the Receiver now asks to pursue cases clawing back every penny in

compensation Zurixx paid to employees, contractors, and influencers over its years of operation.

In many of the ancillary cases, the Receiver is seeking more than $2.3 million, the amount

Plaintiffs settled with the owners.   However, those amounts equal several years of an employee's

entire salary.   These inequities between the owners and the ancillary defendants demonstrate one

of the problems with pursuing fraudulent transfer actions in this type of situation.   If the Ancillary

Defendants violated the TSR or other state laws, Plaintiffs should bring direst actions against them

for violating such laws and prove consumer injury against the employees in the same fashion it

would have to prove it against the owners.

The court, therefore, denies the Receiver's motion to lift the stay on the ancillary cases and

to file more ancillary cases.   The court already told the parties that the Receiver would need to

show that it has exhausted its payments on consumer redress before the cases were reopened.   The

Receiver has not identified any valid consumer redress claims under Section 19.   The Receiver

would also need to prove that insolvency in the context of Section 19 rather than Section 13(b)

claims.   That expense would not be cost effective given that the parties in the enforcement action

did not prove consumer injuries.   If Plaintiffs believe any of the Ancillary Defendants directly

violated the TSR and state laws, they should bring separate actions against them.   The court will

not invoke its equitable powers to allow the Receiver to pursue fraudulent transfer claims against

the ancillary defendants for damages that were never proven in this action

**CONCLUSION**

12

Based on the above reasoning, the Receiver David Broadbent's Motion to Lift Stay in Ancillary Cases and to Allow the Receiver to File Additional Ancillary Cases [ECF No. 423] is DENIED.   The Ancillary Defendants' motions to intervene, filed to respond to the motion in the underlying enforcement action rather than the individual ancillary cases, are deemed MOOT as the court accepted such filings in the underlying case without intervention [ECF Nos. 431, 433].

DATED this 17th day of April, 2023.

BY THE COURT:

DALE A. KIMBALL,
UNITED STATES DISTRICT JUDGE